874 So.2d 739 (2004)
STATE of Louisiana
v.
Allen SNYDER.
No. 98-KA-1078.
Supreme Court of Louisiana.
April 14, 2004.
Rehearing Denied June 25, 2004.
*740 Marion B. Farmer, Covington, Jerry L. Fontenot, Mandeville, for applicant.
Charles C. Foti, Jr., Attorney General, Paul D. Connik, Jr., District Attorney, Terry M. Boudreaux, Gretna, Alfred A. Olinde, Jr., James A. Williams, for respondent.
VICTORY J.[*]
The defendant in this case, Allen Snyder, is before this Court on direct appeal for a second time from his conviction for first-degree murder and sentence of death. Having conditionally affirmed the defendant's conviction upon his first appeal to this Court (See State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832), we remanded this case to the district court to determine (1) whether the defendant's competency to stand trial can be adequately examined retrospectively, and, if so (2) whether the defendant was competent to stand trial. The district court, after a hearing on these issues, determined that a retrospective determination of competency was possible in this case and that the defendant was, in fact, competent to stand trial. We now affirm these rulings.

FACTS AND PROCEDURAL HISTORY
On August 29, 1996, a jury convicted the defendant, Allen Snyder, of the first-degree murder of Howard Wilson. After the penalty phase of a bifurcated trial, the jury unanimously determined that the defendant should receive the death penalty, and he was sentenced accordingly by the trial judge. The incident for which Snyder was convicted arose in August of 1995, when he attacked Mary Snyder, his estranged wife, and her companion Howard Wilson. During the attack, the defendant killed Mr. Wilson by inflicting nine knife wounds, and seriously injured Mary, stabbing her a total of nineteen times.[1]
The defendant was arrested by the police without incident and was subsequently incarcerated at the Jefferson Parish Correctional Center. After the defendant's arrest, but before his trial, Snyder began showing signs of severe depression. Dr. Richoux, a psychiatrist working with the correctional facility, began treating the defendant for depression, and the defense counsel moved for a sanity commission to be appointed to examine the defendant's competency to stand trial.
On August 1, 1996, the defendant's competency was examined by a sanity commission composed of Dr. Debra DePrato and Dr. Barbara McDermott. During their examination of the defendant, the doctors performed the standard tests used to determine legal competency, or competency to stand trial (See State v. Bennett, 345 So.2d 1129, 1138 (La.1977) (on rehearing)). Seven days later, when the sanity hearing was held, both examining doctors submitted a report stating that Snyder was legally competent to stand trial. After considering the report of the two doctors, and the testimony of Dr. DePrato, the trial judge determined Snyder to be legally competent. During the course of the competency hearing, Dr. DePrato testified that in her expert opinion the defendant was "able to assist in his own defense as well *741 as understand the proceedings against him." However, she went on to say that the defendant had difficulty focusing on certain issues and "became mildly circumstantial and tangential." Snyder, 750 So.2d at 847.[2] In accordance with her opinion that the defendant exhibited a deficiency in his ability to concentrate, Dr. DePrato recommended that the defendant's anti-depressant medication be changed from Sinequan to Prozac, which would allow an increased dosage of medication to be given to the defendant without the side-effects.[3]
Dr. Richoux, who was then Snyder's treating physician, agreed with this recommendation, and the defendant's medication was changed to Prozac on August 16, 1996. The defense counsel then moved for a five-week continuance in order to allow the new medication enough time to take full effect.[4] A hearing on this motion was conducted on August 20, 1996, in which the defense counsel stated that although the defendant was technically competent, a five-week continuance was being requested to allow the defendant to have "every bit of [counsel's] assistance, which [counsel] cannot render adequately at this time." Despite a letter from the defendant's attending psychiatrist, Dr. Richoux, which indicated that his inability to focus could interfere with his ability to assist his attorney without waiting six weeks, the court denied the motion for a continuance and did not order any further inquiry regarding this issue.
Following the trial court's denial of the defendant's motion for continuance, the defendant saw two more clinical psychologists. Dr. Thomas Hannie, Jr. examined the defendant on August 21, 1996, one week after his change in medication, and found the defendant to be well oriented and his speech to be clear and well organized. He also noted that the defendant's concentration was excellent, and that he was able to correct the doctor's notes from across the desk and by reading upside down. The second such examination was done by Dr. Elaine Salzer on August 22, 1996. She gave the opinion that the defendant had not yet stabilized on his medication, and while he does not "reflect a psychotic process or formal thought disorder,... at times, this individual's thinking is slow and he can become easily confused."
After these evaluations, the trial counsel for the defendant requested that she be allowed to present in camera testimony to the court to explain her difficulties communicating with the defendant. Although the trial court denied this request, defense counsel was permitted to testify in open court regarding her problems communicating with defendant and relating that her representation of the defendant had been compromised by the defendant's depression and inadequate treatment.
Based on this evidence, this Court determined that the trial judge erred when he failed to further inquire into the defendant's capacity to proceed with trial. Accordingly, *742 we conditionally affirmed the defendant's conviction and sentence, but remanded the case to the district court for a retrospective determination of competency, if one could be made.[5]
Pursuant to this Court's order and upon remand, the trial court held a bipartite hearing to determine if a nunc pro tunc ruling could be made regarding the defendant's competency at the time of trial, and if the defendant was competent to proceed with trial. After hearing testimony of witnesses and reviewing the evidence, the district court ruled that a retrospective determination of the defendant's competence was possible and that the defendant was, in fact, competent at the time of trial. It is from these rulings that the defendant appeals.

DISCUSSION
It has long been established that a person whose mental condition is such that he lacks the capacity to understand the nature of the proceedings against him, and is unable to assist counsel, may not be subject to trial. Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). Thus, in order to proceed with trial, a defendant must be "legally competent." Medina v. California, 505 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353, 365-66 (1992). Louisiana's statutory scheme for detecting mental incapacity "jealously guards a defendant's right to a fair trial." State v. Nomey, 92-1631 (La.1/19/93) 613 So.2d 157, 161. (quoting State v. Rogers, 419 So.2d 840, 843 (La. 1982)).
In evaluating the legal capacity of the criminally accused, we have stated that the considerations in determining whether the defendant is fully aware of the nature of the proceedings include:
whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. State v. Bennett, 345 So.2d at 1138.
More specifically to this case, we have stated that the facts to consider in determining the defendant's ability to assist in his defense include:
whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. Id. at 1138.
As such, a court has a duty to order further inquiry into the competence of an individual any time such competency is called into question. Drope, 420 U.S. at 173, 95 S.Ct. at 904. In Louisiana, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently [emphasis added] lacks the capacity to understand the proceedings against him or to assist in his defense." La.C.Cr.P. art. 641; see also Nomey, 613 *743 So.2d at 161. This language suggests that the defendant's capacity may need to be reevaluated if there is a significant change in the defendant's psychiatric condition between the sanity hearing and trial.
In the defendant's previous appeal to this Court, we decided that the arguments presented by defense counsel "raised the issue of whether defendant could communicate with counsel well enough to allow her to effectively assist him." State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 851. Although the defense counsel stated that the defendant was "technically competent," and that the continuance was requested simply to allow better communication between Snyder and his attorneys, we found that by asking for a continuance, the motion actually was directed to Snyder's competence.[6] Further, we stated that it was doubtful that this due process right could be waived by any actions of the incompetent party. Id. at 852. We held, then, that although a sanity commission had already been appointed to examine the defendant, the purported effects of a change in the defendant's medication and the testimony presented subsequent to the sanity hearing gave the trial judge sufficient reason to order further inquiry into the defendant's ability to communicate with counsel.[7] Thus, it was the "trial court's absolute failure to investigate these claims [of legal incapacity], which were substantiated by objective medical evidence, that cause[d] us to determine he abused his discretion in failing to investigate defense claims of incompetence." Id. at 852.
Subject to our remand, the trial court conducted a bipartite hearing, in which three witnesses testified as to Snyder's competency as of the date of the trial. On December 16, 1999, two of the defendant's attorneys testified concerning the difficulty they had in communicating with the defendant prior to the trial. Mr. Cesar Vasquez, who was appointed as Snyder's counsel during the penalty phase of his trial, testified that he "met with him on approximately three or four occasions over at the Correctional Center, when I would attempt to interview him or speak to him regarding the preparation of his penalty phase" and that during these interviews he "had an almost impossible task of communicating with him, he would break down and cry within ... five minutes of sitting down and talking to him." Thus, he urged that Snyder was not legally competent to proceed with trial as he was not able to assist counsel in the preparation of his own defense.
Additionally, the defendant's guilt phase lawyer, Graham daPonte, testified at the hearing that she had an extremely difficult time communicating with Snyder. When consulting with him, Ms. daPonte found the defendant to be "agitated and difficult to talk to ..., difficult to work with" and "very circuitous and circular in his dealings with me." She additionally stated that although the defendant had expressed the desire to testify in his own defense, she didn't feel that Snyder "could maintain a clear train of thought" and therefore she "was not going to let him testify."
The last witness was presented by the state on September 7, 2000, after a continuance *744 had been granted by the trial judge. Dr. Richard Richoux, a board certified psychiatrist with a sub-specialty in forensic psychiatry, testified that after treating Snyder over a period of about a year and nine months,[8] including the period of time immediately prior to trial, it was consistently his opinion that the defendant was suffering from depression. It was Dr. Richoux's opinion that Snyder's depression appeared:
to be of a reactive nature; meaning that people that are incarcerated and have very serious criminal charges facing them frequently manifest a certain amount of depression which I think makes sense from simply a common sense standpoint.
Addressing the first issue, as to whether the defendant's competency could be examined retrospectively, the doctor explained that:
when one looks at a situation retrospectively, the first question one asks is; based on the data available ... was a mental defect present at that point in time that was of a certain degree of severity.
Dr. Richoux stated that he was "able to look back at [his] treatment of this individual at the point in question and give an opinion about the severity of any psychiatric impairments that he was showing at that time." Thus, he believed that the detailed treatment records that were kept regarding Snyder's treatment, enabled him to give an informed opinion regarding the defendant's past psychiatric condition.
Although Dr. Richoux admitted that during his treatment of the defendant he did not evaluate the defendant's legal competency under the Bennett criteria,[9] he testified that he understood and was experienced in giving such an evaluation. 345 So.2d 1129 (La.1977).[10] He described the test for legal competency as determining:
whether an individual suffers from a mental disease or defect ... which is sufficiently severe to render them unable to understand legal proceedings and/or unable to assist counsel in their defense.
Thus, Dr. Richoux felt certain that he was:
able to give an opinion about what [Snyder] was experiencing psychiatrically in terms of any specific psychiatric diagnosis or impairment and what, based on that, my expectation would be as to his ability to meet the Bennett criteria. Id.

After testifying as to the possibility of a retrospective determination of competence, Dr. Richoux articulated the substance of his findings. In doing so, he explained that the primary issue in determining competency involves the determination of:
whether that individual is suffering from a relatively severe mental disease or defect of some sort at a given point in time. If the mental disease or defect, should there be one present, is not of a certain degree of severity, then it's highly unlikely that whatever that mental disease or defect is going to render the individual unable to understand the proceedings and/or unable to assist counsel in that person's defense."
After careful analysis of his treatment, Dr. Richoux testified that it was never his *745 opinion that Snyder's "depression rose to the level of affecting his comprehension so severely that he would be unable to assist counsel with a trial." Thus, in Dr. Richoux's opinion, Snyder was legally competent at the time of trial.
In addition to the testimony by Dr. Richoux, the trial court also consulted the pre-trial testimony of Dr. DePrato, from the defendant's competency hearing, along with the report she submitted with Dr. McDermott. Likewise, the court took into consideration the letter submitted by Dr. Hannie, and a separate psychological evaluation by Dr. Salzer.[11] In total, the district court assessed the evaluations of five psychiatrists/ psychologists who had all met with the defendant prior to trial.
Although conflicting testimony was presented to the trial court concerning Snyder's legal competency at the time of trial, there is a legal presumption that a defendant is sane and competent to proceed. La. R.S. 15:432; State v. Bridgewater, 00-1529, p. 6 (La.1/15/02), 823 So.2d 877, 888; State v. Martin, 00-0489 (La.9/22/00) 769 So.2d 1168, 1169. Accordingly, the defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial. State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365, 1366 (citing Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)). A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion. Bridgewater, 823 So.2d at 888; Martin, 769 So.2d at 1169. The testimony of Dr. Richoux and the reports submitted by the four other psychiatrists/psychologists, though they differ as to the seriousness of his condition, all indicate that Snyder had legal capacity at the time of trial. Thus, given the testimony and evidence presented in the nunc pro tunc hearing, we find that the weight of the evidence supports the trial court's ruling that it was possible to determine the defendant's competency and that, in fact, the defendant was competent at the time of trial.

CONCLUSION
After reviewing the record of the hearing conducted by the trial court, we find that the lower court has complied with the procedural due process requirements that must be afforded him under State v. Bennett, 345 So.2d 1129.[12] The testimony and evidence presented during the nunc pro tunc hearing support the trial court's determinations of competency. Specifically, the testimony of Dr. Richoux is convincing as to the ability of the defendant to communicate with his counsel and as to the defendant's cognitive ability to understand the nature of the proceedings during the trial. Thus, we find no error in the lower court's ruling that the defendant was legally competent to stand trial.

DECREE
In accordance with the above reasons assigned by this Court, we unconditionally affirm the judgment of the trial court and the sentence of death. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that court denies his petition for certiorari; and either (a) the defendant, having filed for or and been denied certiorari, fails to petition the *746 United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
SHORTESS, Justice Ad Hoc, concurs in the result and assigned reasons.
SHORTESS, J., (ad hoc.) concurs.
I agree with the majority's finding that the nunc pro tunc hearing amply demonstrated that it was possible for the Trial Court to determine the defendant's competency to stand trial retrospectively and that he was competent to stand trial.
I write further to point out that during the mitigation stage of the penalty phase Allen J. Smith, a fleet superintendent for a barge and shipyard operation, who had employed defendant for seven or eight years, testified for the defendant.
In an open ended question coming at the conclusion of his direct examination witness Smith was asked by counsel, "is there any particular incident that stands out in your mind that Allen many have participated in .......?" The question drew a hearsay objection from the state. Witness Smith then responded "okay, he saved a man's life on ... that fell over board on the bow of a barge". The State objected again stating it had not been shown that the witness personally saw defendant saving a man. Smith was not a personal observer, so the Trial Court instructed the Jury to disregard the comment. Assuming the fact to be true and competently proven the Jury was never able to consider in mitigation whether defendant, convicted with taking a life in the first degree, in fact, had earlier saved a life.
Mr. Smith was an excellent mitigation witness, who testified also, that he had watched defendant progress from laborer to welder, to fitter, to crane operator and finally to night dispatcher. He stated, "My impression in dealing with him, Allen, was that he was a very caring person."
Counsel points to nothing else during trial that could have negatively impacted upon defendant's present legal competence that the Trial Court found. In my opinion it was not a "lack of focus or competency" problem that kept the Jury from hearing the facts about the defendant's "lifesaver experience."
I respectfully concur in the result, which unconditionally finds defendant competent during this trial, which makes the conviction and sentence final.
NOTES
[*] Retired Judge Melvin A. Shortess, assigned as Associate Justice Ad Hoc, sitting for Associate Justice Jeanette T. Knoll, recused.
[1] The nature and specifics of the crime for which Snyder was convicted are discussed in State v. Snyder 98-1078 (La.4/14/99), 750 So.2d 832.
[2] For a transcript of the relevant testimony from the sanity hearing, refer to State v. Snyder 750 So.2d at 848.
[3] When questioned about the defendant's medication, Dr. DePrato advised that due to the side effects caused by Sinequan, including urinary retention and constipation, he was given a low dosage; and while this dosage had helped the defendant's symptoms of depression, it did not totally alleviate these problems. Additionally, her testimony revealed that because of the side effects, he wasn't taking Sinequan consistently enough to be fully effective.
[4] The testimony of expert witnesses suggests that, although Prozac can take effect in as little time as a week from when it is started, it takes six weeks for the medication to reach its maximum effect.
[5] Id. at 863.
[6] La.C.Cr.P. art. 642 allows "the defendant's mental capacity to proceed [to] be raised at any time by the defense, the district attorney, or the court" [emphasis added].
[7] In Snyder, we stated that "[defense counsel's] difficulty in communicating with the defendant ... coupled with the medical evidence presented, while not necessarily dispositive of the issue, were nevertheless sufficient to warrant the trial court's attention." 750 So.2d at 851.
[8] Dr. Richoux had seen the defendant approximately 21 times during this time period.
[9] The factors to be considered in determining legal competency are explained supra p. 742 in this opinion.
[10] At the time of the hearing, Dr. Richoux had been involved in over 5,000 sanity commissions in which the Bennett factors were used to evaluate the competency of an accused to stand trial.
[11] The opinions of Drs. Salzer and Hannie are discussed supra p. 741.
[12] See also Cooper, 517 U.S. at 354, 116 S.Ct. at 1377; Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); State v. Nomey, 613 So.2d 157 (La.1993).